Good morning. My name is Lawrence Padway, and with me today is Robert Weaver and Walter Crump, and Mr. Affonso is also present. In 2008, the United States Supreme Court told Metropolitan Life specifically, in MetLife v. Glenn, that it was going to be held to higher than marketplace standards, and that it had to act as a claims administrator in the sole interest of the plan participants and plan beneficiaries. So if we start by looking at what's the marketplace rule, not for trustees, but just for insurance companies in general, in a non-ARISA situation, and we have very... You contend that the Supreme Court case to which you refer is in any way related directly to the facts in this case? That's a very different context, isn't it, that the Supreme Court was addressing? In MetLife v. Glenn? Yes. So you're just saying that these big insurance companies have to be careful what they do? ARISA beneficiaries are trustees. It's a trust standard. It's not a contract standard. And so it's higher than marketplace. When they're acting as a plan administrator? Yes. Okay. And the marketplace rule is, in the conditional receipt cases, the leading one is Thompson v. Occidental Insurance, which says that if the insurance company is holding the premium, the insurance is in force. If, after looking at the application, they don't want to be the insurer, they can send the premium back. But until they do that, they are acting as the insurer. Wasn't it significant that there was an ambiguity as to exactly how the policy attaches that? As it goes into effect, did it go into effect immediately and could be rescinded if the medical situation didn't warrant it? Sure. Wasn't that ambiguity key to the court's analysis? Well, not if you look at the cases overall, especially when you get to the Ninth Circuit case. Was there an ambiguity in Thompson, though, that the court focused on? Yes. And there's ambiguity here. And let me just turn to that since that seems to be of some interest. The one definitive document in this case which sets out the terms of the insurance benefit is the insurance policy. It's fully integrated, and it's the only document which doesn't say other documents might conflict with this, and if they do, then something else will control. So the insurance policy provides some limits for the coverage, and it has a provision at ER449 under the heading of incontestability, statements made by covered persons. It says any statement made by a covered person will be considered a representation and not a warranty. MetLife will not use such statement to contest insurance, reduce benefits, or defend a claim unless the following requirements are met. One, the statement is in a written application or enrollment form. Two, covered person has signed the application or enrollment form. And three, a copy of the application or enrollment form has been given to the covered person or his beneficiary. Now, there is no application in this record. It's a corporate application form. It's a corporate policy. It's not an individual policy. Yes, but we're talking about whether or not coverage is provided to a covered person under the policy, and the only way that's provided in this policy for there to be some kind of rescission or reformation is if the covered person makes a false statement in his or her application. Counsel, perhaps I'm missing something, but I don't think the issue here is whether there's coverage. There is coverage. The question is the amount of the coverage. Right. So what you're reading there really deals with whether there's coverage. The issue seems to be you claim there's an estoppel concept. You claim there's ambiguity. Obviously in the plan there's a limit ten times roughly the salary. You say they took out the premium for $1 million, and therefore there's a stop. So that's really what we're dealing with here, isn't it? Well, what we're really dealing with in terms of ambiguity is nothing in the policy says what happens if you have these circumstances, if an application is made for more coverage than should have been allowed, if the premium is paid, and if the insurance company doesn't do anything. Well, they didn't have any time to do anything, did they? Oh, sure they did. They didn't start to do any underwriting until after the death claim came in. Why don't you walk through the dates for us in terms of that application for the million, the death. Okay. And when under the terms of the policy the insurances began. Well, open enrollment is in November. The policy becomes effective January 1. Mrs. Afonso died in February. The claim was filed in March, and there was no attempt to do any underwriting until after the claim was filed. What do you mean by underwriting? Well, in this case, underwriting consists of finding out whether or not her salary is high enough to justify this amount of coverage. So it's that kind of business. We're not talking about medical underwriting or something like that. Right. But when the confirmation comes back, it basically says that the provisions of the plan trump any conflicting representations. And you haven't mentioned that. Well. What in your view. The plan does not say. Do you want to hear the question? Yes. Okay. Thanks. I just am asking, in your view, what is the significance of that document? In this case, not very much, because the plan does not say what happens if an application is made for more coverage than is permitted, the premium is paid, and the insurance company does not underwrite before taking the premium. So we have something which is not covered by the plan. The plan tells you what you're entitled to, doesn't it? Yes, it does. And so you have more than one point of the plan to look at. The plan says you're entitled to ten times. She was going to get under this more than ten times. So what's your best argument as to why we should ignore that part of the plan, which basically says, yes, you're covered, but you're only covered to this ceiling? I think the best argument is the McLeavy case, which is in the. Which case is it? McLeavy, and let me find the citation. It's in our supplemental citation. Right. I don't need the citation. I just want to hear the case name. McLeavy. The Fourth Circuit case. Yes, that's the case. It's very similar. It involves MetLife. And the other case that I would refer to would be the Lesser case out of the Central District. It's a district court case. But that's the case in which the same thing happened, same insurer. And in that case, the district court noted that the Department of Insurance had warned MetLife that its practices were out of bounds. So I think, you know, in case law, this is at least the third case which has had the same problem with the same insurer. There's a warning from the Department of Insurance. It's pretty apparent. Is it your contention that those two cases are on all fours factually with this case? Yes. Absolutely. How do you distinguish the reliance, significant reliance on McLeavy? I would do it the way that the court did it in Krauss, which is there's basically ‑‑ well, if you look at this as a waiver and not an estoppel, first of all, you don't have reliance as an issue. But people ‑‑ But isn't McLeavy principally an estoppel case, though? These cases are looked at either as estoppel or waiver. But if you look at the way that, for example, Krauss analyzes it, the estoppel, the detrimental reliance is there as a matter of law. Because if you don't have a certain amount of insurance, you might, in the example that they use, well, you might say, well, I'm going to want more in salary so I can put something away. So there are a lot of ways in which people rely on it. You rely on it when you pay the premium. But I think if ‑‑ anyway, so I think from the case law, I think that's where our strongest argument is. But the reliance in McLeavy was the failure to get other insurance when they could have gotten other insurance because they thought they were covered here. We don't have that situation, do we? Well, we don't know. We don't know. I mean, you know, you can insure toxic sites for pollution. It wasn't raised. There's nothing in the record. Well, but if there was that option, that was for you to raise, not the insurance company, wouldn't it be? Well, in ERISA, first you have a denial letter, which tells you what you need to do to perfect your claim. And unless it's in the denial letter, then Mr. Afonso was not represented at that time. You can't expect a layperson to know what he needs to do to perfect the claim. And that would be Boutin and Safon. And 29 U.S.C. 2560.503-1, I think G, I think is the section. So in the first instance, it needs to be raised by the plan needs to say, okay, here's what you would need to show us before we would, you know, honor this. But what you have here is you have one of two situations, or I guess one of three. One is, MetLife can take the premium and keep it and just not provide anything for it. By the way, did MetLife ever purport to refund a portion of the premium that you paid? Yes. And was that received? They at least offered to do that. I don't remember if that was accepted or not, but there was an offer to return the premium. That is the second alternative. And in the Fourth Circuit case, that's what they went with on the first round. And then after Amara came down, they reconsidered it and they said, well, wait a minute, now we've got more options. And the more appropriate thing is to follow what normally happens in insurance and give her the benefits. I see another question on McCravey, because as I read that, the key error of the district court was thinking that estoppel and reliance principles didn't apply at all, and you could only get refund of the premium. So the court said, no, you were wrong about that. But they remanded for further proceedings. And in our case, we have a situation where we've actually, you know, looked at whether there's reliance. We, meaning the district court, had actually gone ahead and looked at those issues. So it wasn't a question of an error of law made by the district court. I'm sorry, I did not see where the district court looked at reliance. Well, it talks about page 9, the plan's terms preclude reliance on oral modifications. Right. But there wasn't really any discussion of estoppel. But I think, if I can, just as one other way to look at this, is that this is a very specific insurance rule in the conditional receipt cases. And because it's a very specific insurance rule, and I think we cited Unum v. Ward on this point, it's not preempted by ERISA. I mean, the issue in this case is governed by state law. And the state law cases are, in California, certainly are right with us. In the Ninth Circuit case in Transamerica, which we cited. I mean, so I think, you know, there's another problem there. But I think the, you know, and I know I am out of time, but, you know, the rule that all you have to do is refund premiums. If you if you completely fail to do underwriting, you tell a person that they've got the coverage. You put a caveat on it so that nobody really knows that they've got the coverage. But, you know, the rule that MetLife argues for would give them every incentive to wrongfully accept premiums, even if they had no idea as to whether coverage existed, or even if they affirmatively knew it did not. The fiduciaries would enjoy essentially risk-free windfall profits from employees who paid premiums on nonexistent benefits, but who never filed a claim for those benefits. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Rebecca Hall. I represent the appellees in this case. It's hard to know where to start after that, but let me start at what I think is more or less the beginning here. This case is an attack on two bedrock principles of ERISA that have been in effect for 40 years. First of all, a plan will be enforced as written. And second, the plan cannot be changed or amended orally or informally. This is a situation in which there was a written benefit plan, quite an extensive one, actually, one section of which dealt with supplemental life insurance. And the benefits under that plan were insured, which is not at all unusual for life insurance. It would be strange for an employer to fund its own life insurance program. As Judge Selma mentioned earlier, the policyholder is actually the employer. It is not an individual. There was no underwriting on an individual level. The concept doesn't apply in group insurance. It's just completely different. This is a situation in which there really is no doubt and there's no ambiguity as to what the plan provided and actually what the policy insured. There was a maximum of ten times benefit-eligible earnings available as coverage. Under that formula, Mrs. Afonso, who was coming into the Morgan Stanley plan for the first time as a former employee of Smith Barney, was entitled to up to $500,000 of insurance coverage, which was more than twice what she had in her old plan with Smith Barney. And because she was coming in during open enrollment, she was entitled to that $500,000, despite being gravely ill and surely unable to obtain individual insurance in the marketplace. And I agree with the court's observation. It is the claimant's, the plaintiff's, the appellant's burden to put forward facts to support any kind of waiver, estoppel, detrimental reliance, whatever it is that's being contended. I think it's instructive. There's no such claim in the complaint. I think that a conscious decision was made early on that there were not facts to support that. If you look at the first amended complaint, you will not find anything that even comes close to being facts that would support that. In fact, I believe it was waived. Although Mr. Afonso tried to raise it at the district court level, I think it was improper for him to have done so, and we objected to it. And we objected again in our brief here, because it just was not raised. But factually and legally, it couldn't be supported in any event, because there was no detrimental reliance. There was, even if there had been actual reliance on the alleged statements, which I do not accept as accurate, it would not have been reasonable in light of the disclosures that were made. Reliance, even if it exists factually, has to be reasonable. It cannot be simply I want this to be the case, and therefore it must be the case, and I'm relying on it being the case. That's not the law. In the fall of 2009, oh, by the way, I'd like to straighten out the timeline just a little bit and make it more precise. The open enrollment period was in November of 2009. The coverage took effect January 1, 2010. Morgan Stanley's payroll department made a payroll deduction for life insurance, and I assume other benefits as well, sometime during January. And on February 1, 2010, Mrs. Afonso passed away. So we're talking about a period of four weeks, and it's not even clear from the record when exactly the payroll deduction was taken. If it was at the beginning of the month, the middle of the month, the end of the month, whatever it might have been. There also is no evidence suggesting that MetLife had any information from Morgan Stanley yet about who had signed up. So at that point, the record does not reflect that any branch or part of MetLife had received any information about Mrs. Afonso at all? No, the record does not reflect that, and it would not be surprising. I do not know, and I'm not representing to the court what actually happened here, but I know from many other life insurance cases with this company that typically they don't know who they're insuring, especially with a large employer, until they get a claim. Because people go in and out of plans, employees come, employees go. They may or may not, you know, seek conversion of a policy or whatever. But typically, it is the employer, the plan administrator, that keeps the records. It's not ---- Would you agree that the principles of estoppel could apply in this case? Not on the facts on the law, no. I don't ---- I mean, I guess, you know, what you said is very similar to McCree v. In other words, the daughter, the girl was 25 when she was murdered, but she was only eligible through 24. They were continuing to pay the premiums. They didn't know until the claim was made, just like you said. But what the court said was those principles are available to be reviewed in the face of what happened. So you're saying it's not ---- they're not even principles that could apply under the Amara case? Not in this situation. First of all, I happen to disagree with McCree v. I think it was wrongly decided, but ---- And it's not the circuit, but it is ---- Right. It is a case that has some, you know, distant similarity. Some resonance. But leaving aside the fact that I think it was wrongly decided, I think it's also distinguishable on an important basis. In that case, there had been actual agreed coverage for a long period of time. It was not a situation in which there was a question as to whether there would be coverage or in what amount. There ---- it had been in existence, there had been an insurance relationship for quite some time, and then the individual, the daughter, reached an age where she no longer was eligible to be covered, and no one brought that to anyone's attention, apparently, based on the record. We don't really know that. But I think that is significantly different from a situation like what we have here, where the person is informed right up front there is a limit on the insurance that you can get. And here's what the limit is. But presumably, if the McCree vies had read the policy, they would have known early on in the relationship that there's no coverage after age 24 or 25. There might or there might not have been that kind of knowledge if they had read it. I think what struck me about it is I wondered why or whether they received some sort of conversion notice, which is what you would typically get at the end of otherwise applicable coverage. But it appears that no one contacted them and said, by the way, even though you've had insurance for, I don't know, five years or six years or whatever it was, you're not going to have it after the following date. I don't know, in fact, whether that did or didn't happen, but that strikes me as quite a difference from what we have here. But my point is that would have been in the initial policy. They would have been on notice in the same way that the plaintiffs here were on notice as to the limitation of coverage. Presumably. I don't know the answer to that. The opinion to my reading is pretty sparse in terms of the actual context and facts. I don't really know the answer to that. For purposes of this case, I get your point that the pleading itself did not establish the kinds of things you would normally find in setting forth reliance and estoppel arguments. But putting that aside for the moment, if I understand you correctly, it was her employer who at this point would have been MetLife. I don't mean MetLife. Morgan Stanley. Morgan Stanley, not Smith Varney. Right. Nobody at MetLife has seen anything yet. What is your position insofar as what Morgan Stanley did? Did they act in some way in a relationship as an agent of MetLife? Were they doing this independently? In other words, most of the interaction, indeed all of the interaction, that seemed to have occurred between the parties before the death occurred not with MetLife directly, but with Morgan Stanley. How should we factor that in, if at all, in our analysis? I don't believe that you do, actually. Morgan Stanley is not an agent of MetLife. It's not the plan administrator. The plan administrator is a specific committee. In fact, I don't think it was in the court's summary judgment order. There was an earlier order where the court commented on that, that Morgan Stanley itself basically had no role. Well, actually, it may be in the summary judgment. They took the money out of the paycheck, right? Right. What did they do with it? I assume the record does not show. If it followed what I would expect as a normal pattern, it made an aggregate payment to MetLife and said you're insuring 50,000 people or whatever. Would this have been typically at the end of the month or some particular time or just as received? Or do we know? I assume it was sometime probably after the end of the month would be my assumption, because presumably it's a month-by-month payment. These kinds of deductions typically would be taken from most employers, would be taken in arrears. When Your Honor pays for federal life insurance, I imagine that on February 1st you make the payment that actually covered January. You don't pay in advance. Unless there's a suppressor. Or something, yes. And it adds in some strange permutation of the government. But that would be a typical pattern. I can't make a representation to the court about it here because it's not in the record. That's not a subject that was explored. I think it is important to note that there are a number of representations made to the court in the appellant's briefs, particularly in the reply brief about what documents do or don't say, about what the record does or doesn't say. And I would urge the court to look at the actual cited materials, because in rereading them again yesterday, I was reminded that in many instances, either they don't really say what's being argued, or they say that in a context that makes it inapplicable here. So it results in some confused situations here. I also think that it's important to note that these asserted discussions with people at the Morgan Stanley Benefits staff, if you look at Mr. Afonso's declaration, are somewhat different in tone and content from what is portrayed in a broad brush argument. And I say that because, for instance, he testified that he or they, I'm not sure which, called and asked whether the computer showed the coverage levels that had been requested by Mrs. Afonso, and he was told that they did. But also he was told, and I'm quoting here, if the amount was in question, we would be contacted in the future to make an adjustment. That's at excerpt of record 840. I think it's very clear that he was consciously aware that this was not a hard decision, fast thing, that she had requested a specific amount. I mean, it's been represented here that he's being told, oh, absolutely, you have a million dollars in coverage. But that's not actually what he said in his testimony. That's in his own affidavit, it's excerpt of record page 840. I think that's important. As far as the cases that the appellant is relying on here, I've read them. Very few of them are even group cases, and the ones that are are readily distinguishable. The individual cases are a very different matter from what we have here. That's an individual specifically negotiating with an insurance company, dealing with them one-on-one. And there is actual underwriting, which is what was going on in several of these cases. And the issue was, was there a policy created temporarily while the underwriting was going on? Here, as I said, there's no underwriting going on. There's no underwriting because it's a group plan. That's the whole beauty of a group open enrollment, is you don't have to prove that you're insurable. You don't have to prove anything except that you're eligible. Here, she was an employee, she was eligible, that was the end of the discussion. She was eligible for what the plan provided. She was not eligible for more than what the plan provided. But that's not an underwriting question. The one case that is said to be similar to ours is the Crouse case, which was, in fact, a group case, but it's very different. In that case, the coverage was in effect for about 11 years. And ultimately, it was determined that there was a problem because this individual was working part-time. But that limitation, as far as I can tell, and based on the Court's discussion,  the limitations were communicated. They were communicated very clearly and in multiple places. So it is not a situation in which the person did not get the disclosures they should have gotten under the law. They got them. In fact, as we mentioned in our brief, the First Amendment complaint makes it clear that they got them during the enrollment period. That was why they called the benefits staff to ask about how much her compensation was for purposes of computing the coverage. And I gather that your point about Mr. Alfonso's call asking if there were an adjustment, what would happen, reflected their having read the materials that they received. Right, and also reflects that it wasn't nearly as categorical as he's trying to make it sound now, or as the briefs make it sound, I should say. His testimony is refreshingly frank in terms of disclosing. In fact, he was told that there was an issue, that there was the potential that it would be adjusted. And what we have here is a situation in which it was only a month later that Mrs. Alfonso unfortunately passed away. There was no time for any of that to occur. Now, there's one final thing that I would like to mention very briefly, and that is the reliance on declarations from a woman named Nicole Carson, who said she was also a Smith Barney employee, and she got a million dollars of coverage when her salary is about the same. The problem with that argument, which was never addressed, although they submitted two different declarations from her, is that Smith Barney employees had grandfathering disabilities. It's addressed in docket number 111. I assume it's in the excerpts of record. I'm sorry. I don't have a specific number in front of me. But they had grandfathering rights, so that they would not be stuck with less life insurance than they had under the old Smith Barney plan. So the question of whether that was an appropriate number for Nicole Carson turns on what kind of coverage she had under the Smith Barney plan, because it's not. And it is our position that those declarations, therefore, lack foundation and relevance, because there's no way to tie these concepts together unless you know what her rights were under the other plan. Thank you. Thank you, Your Honor. Mr. Padua, you've used up your time, but I think we should give you some time for rebuttal in any event. So we'll give you another minute. Thank you. With respect to all of the things which would be nice to have in this record, including how often this happens and whether or not it is a profit-centered format life, we asked for discovery. We didn't get any. So we're stuck with the administrative record as it exists. But I was interested to hear about the grandfathering rights, because the one document that MetLife says that Mrs. Afonso received is a benefit guide. And the pages that are important are ER 409 and 410. And Mrs. Afonso, and let me just read the relevant part here. And it does say, you know, you can ask for yourself up to ten times your benefit-eligible earnings for the supplemental life insurance. Then it has a note. Now, it is totally unclear whether that is still subject to the ten-times limit or not. And Mrs. Afonso falls into that paragraph. I'd be happy to provide the citation to the record, but I would need to do it by letter, because I can't pull it out that fast. So if she's reading this, and they say that they sent it to her, and it's the only thing that MetLife says she received. Now, if she looks at that, it's not at all clear that she is bound by ten-times benefit earnings. The summary plan description is only available online. And it's in the guide that if you want to look at the summary plan description, you can go online and do that. But it's not like Mrs. Afonso has that document mailed to her, or that there's a link to it. There's no evidence that she ever looked at it. What was it that Mr. Afonso looked at that prompted his statement in his affidavit about if there was a question about coverage, whether there would be a refund? I don't know. I don't think that there is. I don't know what that is. But the only document that an actualist, Morgan Stanley, put in the declaration that this guide was sent to Mrs. Afonso. All right. Thank you. I think we've now given you five extra minutes. So I think in fairness to all sides that will consider the case of Afonso v. Metropolitan Life submitted, thank you both for your argument this morning. And the Court is adjourned.
judges: Selna, McKeown, Smith